SOUTHWICK, P.J.,
for the court.
¶ 1. James L. Armstrong filed suit against his ex-wife, Shirley Caryn Hanson,[1] to determine what portion of his stock benefit and savings plan his former wife was entitled to under their 1983 judgment of divorce. The chancellor determined that she should receive the specific number of shares that equaled one-half of the number of shares that were in the plan at the time of divorce. Ms. Hanson appeals. She alleges that since the date of the divorce, stock splits and additional stock paid as interest have more than quadrupled the number of shares to which she is entitled. We largely agree with this position, though with one modification that we will discuss. Consequently, we reverse and remand for computation of Ms. Hanson’s ownership.
STATEMENT OF FACTS
¶ 2. James L. Armstrong and Shirley Caryn Hanson Armstrong were divorced on December 16, 1983, after almost nine years of marriage. The judgment of divorce provided tp each party one half of the ownership of certain listed property, including the former husband’s stock plan.
All of the shares in [Mr. Armstrong’s] stock benefit plan and savings plan through his employer, Chevron, U.S.A., accumulated through the date of this Judgment. The actual cash value of the member account stock and savings plans are unknown at the present time, but are to be ascertained by mutual agreement of the parties.
An internal Chevron memorandum entered into evidence revealed that at the time of separation, each party was entitled to 349.966 shares of stock in the Contingent Profit Sharing Plan and 24.126 shares of stock in the Employee Stock Ownership Program (ESOP) account. Though the judgment refers to its own 1983 date and Chevron’s figures apparently are from the 1982 separation, the parties do not dispute the initial computation of shares of stock.
¶ 3. Instead, the suit concerns dividends and stock-splits since 1983. Chevron usually paid dividends on a quarterly basis to shareholders who held shares as of the relevant closing date. During the time period in question, Chevron paid cash dividends. The dividends paid on stock held in the account were used to purchase additional shares of Chevron stock.
¶ 4. In addition to these dividends that apparently were being paid on a regular basis since the divorce, Chevron in 1994 also had a two-for-one stock split. In the traditional stock split, a hypothetical shareholder who holds 50 shares of ABC Corporation worth ten dollars per share would after a two-for-one split hold 100 shares worth five dollars per share.
¶ 5. Whether Ms. Hanson is to be left solely with the original 1983 number of shares despite one stock split and numerous payments of dividends in the form of fractional shares is impacted by an agreement that was signed in 1989. On June 2, 1989, Ms. Hanson signed a letter agreement, later signed by Mr. Armstrong on July 7. There is evidence that the letter agreement was prepared at the request of Mr. Armstrong. It was addressed to the Profit Sharing/Savings Plan Administrator at Chevron. Because of changes in federal statutory requirements regarding the division of retirement plans under divorce de *796 crees, greater clarity was needed. The relevant language included “that we have reached the following agreement as to how [the judgment of divorce] is to be implemented with respect” to the stock benefit and savings plan. The letter stated that both signatories agreed that Ms. Hanson could request 24.126 shares in kind or cash from the ESOP account and 349.966 shares from the contingent account. According to the document, “the amounts distributed to her ... shall be in complete satisfaction of her court-awarded interest ... and [Ms. Hanson] hereby releases and discharges the Plan from any and all other claims she may have” in regards to the Chevron accounts.
¶ 6. Just a few weeks after the agreement, Davy Marshall of Benefits Administration for the Chevron Corporation sent Ms. Hanson a letter containing a benefit election form. This July 20, 1989 letter informed her of the exact number of shares due her and noted that “[t]here will be no accruals made to your shares.” The term “accruals” refers to both dividend payments and possible stock splits. An attorney for Ms. Hanson responded to this letter. The attorney agreed that the number of shares was correctly stated but insisted that she was “entitled to any and all accruals since ...” separation.
¶ 7. Now knowing of the disagreement, Chevron responded by a September 1989 letter that it would withhold payment of Ms. Hanson’s share of the accounts, plus any accruals since the date of separation, until it “receive[d] a court order directing it specifically to pay such accruals to her.”
¶ 8. No further attempt was made to resolve this issue until Mr. Armstrong retired from Chevron in July 1999. Mr. Armstrong was informed by letter from Davy Marshall dated July 23,1999, that an administrative hold remained on his account because of the unsettled dispute as to the number of shares to which his former wife was entitled. Marshall told him that Ms. Hanson could receive as few as 349.966 shares as per the letter agreement or as many as 1603.4161 shares if she received the full benefit of all accruals since 1982. By the time a hearing was held in this matter, the number of shares had grown to approximately 1664.
¶ 9. Almost immediately, Mr. Armstrong filed suit against his former wife. A hearing was held on October 13 and November 10, 2000. The chancellor entered judgment on April 3, 2001, finding that Mrs. Armstrong was entitled to 349.966 shares from Mr. Armstrong’s contingent account and 24.126 shares from his ESOP account. The chancellor found that Mrs. Armstrong was not entitled to the benefits of dividends paid since 1982 or a May 1994 stock-split. Ms. Hanson appeals.
DISCUSSION
¶ 10. A property settlement agreement is a contract. East v. East, 493 So.2d 927, 931-32 (Miss.1986). Contract interpretation is a question of law reviewed de novo. Warwick v. Gautier Utility Dist., 738 So.2d 212, 215 (Miss.1999).
¶ 11. The chancellor found that neither the judgment of divorce nor the letter agreement addressed the ownership of stock splits or dividends. The chancellor concluded that Ms. Hanson understood the significance of the letter agreement when she signed it. At trial, she denied consulting an attorney before signing the document. However, a discovery admission stated that she was represented by and did consult with an attorney before signing the letter agreement.
¶ 12. The chancellor considered both documents together to determine the intention of the parties. The chancellor found that an “objective interpretation” of *797 the Letter Agreement was that Ms. Hanson “did not intend to receive [the stock split and dividends] through the Judgment of Divorce and is not entitled to [the stock split and dividends] in reference to the Chevron U.S.A. stock.”
¶ 13. Ms. Hanson finds no ambiguity in the 1983 divorce judgment. To her, it provided for her to receive an effective interest as of that date, with all the benefits that later accrued to that interest. The judgment stated that “each are hereby awarded exclusive use, possession, and ownership of one-half (/&) of all property jointly owned by the parties....” The judgment also provided that the “actual cash value of the member account stock and savings plans are unknown at the present time, but are to be ascertained by mutual agreement of the parties.”
¶ 14. Regardless of the manner in which the 1983 judgment should be interpreted, another document is important. No attempt to make the retirement plan ownership clear was made until 1989. The letter agreement stated that its purpose was to express “how the court’s order was to be implemented with respect to the Former Spouse’s marital property interest in Employee’s ESOP Account and Contingent Account under the Plan.” The payment of the agreed number of shares was in “complete satisfaction of her court-awarded interest” in the retirement accounts. Ms. Hanson also agreed to release all future claims to her ex-husband’s accounts. Whatever the 1983 agreement might unambiguously be said to do, this later agreement must be considered as well.
¶ 15. Ms. Hanson argues that this letter agreement was not enforceable due to inadequate consideration. She also claims not to have understood its import. We find that the chancellor adequately dealt with the issue of advice, as Ms Hanson’s admission in discovery to having the assistance of counsel was never properly withdrawn. Insofar as consideration is concerned, we find that the 1989 agreement was a necessary and explicitly referenced supplement to the 1983 judgment. That judgment did not indicate the number of shares to be divided by the parties. ' It specifically provided that the parties would agree later what each was to receive. The letter agreement is simply the fulfillment of this directive. The chancellor was correct in considering it.
¶ 16. We find, though, that the chancellor erred as a matter of law in the interpretation of its effect. The chancellor determined that the letter agreement divested Ms. Hanson of all dividends and any possible stock splits prior to and subsequent to execution of the 1989 Letter Agreement. We find that any stock dividends that accrued prior to that date were relinquished. No coercion, duress, misrepresentation, or any other act by Mr. Armstrong is shown to have led her to the execution of the agreement. She may well have been entitled to more had she refused to sign and instead pressed her position in litigation. The effect of the agreement was to end any dispute. Reaching agreement was its own consideration.
¶ 17. Similarly, though, we conclude that the agreement gave the nearly 350 shares of stock to Ms. Hanson as of that date. Nothing that thereafter occurred could divest her of what she had just received. If 350 shares of stock as of 1989 later became 700 shares, and if those shares were accumulating interest, all of that later accumulation was owned by her beginning in 1989.
¶ 18. The chancellor’s decision had the effect of declaring that Ms. Hanson was not the owner of 350 shares in 1989; she *798 was only assigned the number “350.” When a specific assignment to her was later made, no matter when it occurred, then Ms. Hanson would receive 350 shares. Instead, we find that the 1989 agreement confirmed that Ms. Hanson had 350 shares as of that date. She could request the withdrawal of shares. She had all the incidents of ownership and those shares were vested in her. Whatever benefits accrued to “her” 350 shares since 1989 was hers to enjoy.
¶ 19. Dividend growth needs to be computed on remand. From the date of separation in 1982 to the date of the hearing in December 2000, it appears that 961 additional shares would have been received through dividends and subsequent repurchases. Perhaps instead that dividend growth occurred only after 1989. The appropriate time period to be considered for dividends would begin on July 7, 1989. Thus the one part of Ms. Hanson’s claim that we reject is that she is entitled to the dividends that would have been payable on the 350 shares prior to her execution of the 1989 agreement. That document relinquished any prior dividends. To hold otherwise would declare the agreement a nullity, which we find no basis to do.
¶ 20. On remand, the chancery court should conduct such proceedings as are necessary to determine the number of shares that consist of all stock splits on the 349.966 shares of Chevron stock and all dividends since the July 7, 1989 agreement. Consistent necessary adjustments to the 24.126 shares from the ESOP account also should be made.
¶ 21. THE JUDGMENT OF THE JACKSON COUNTY CHANCERY COURT IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, CHANDLER AND BRANTLEY, JJ., CONCUR.
MYERS, J., NOT PARTICIPATING.

. The appellant's brief informs us that the former Mrs. Armstrong now uses her maiden name of Hanson, which is the name by which we will refer to her.